IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

RUSSELL D. TOWNER,

                Plaintiff,

                               Civ. Action No.
                               3:15-CV-0963 (GLS/DEP)

     v.

PATRICK HOGAN, *et al.*,

                Defendants.

_____

APPEARANCES:                OF COUNSEL:

FOR PLAINTIFF:

BENJAMIN LAW OFFICE       RONALD R. BENJAMIN, ESQ.
P.O. Box 607
126 Riverside Drive
Binghamton, NY 13902-0607

FOR DEFENDANTS:

FRANK MILLER LAW OFFICE    FRANK W. MILLER, ESQ.
6575 Kirkville Rd.              CHARLES C. SPAGNOLI, ESQ.
East Syracuse, NY 13057

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

This is a civil rights action brought pursuant to 42 U.S.C. § 1983 by

plaintiff Russell D. Towner, a former inmate of the Tioga County Jail

("TCJ"). As narrowed through a series of decisions by the court, in his remaining claims plaintiff alleges that three defendants employed as investigators by the Tioga County Sheriff's Office ("TCSO") subjected him to false arrest and malicious prosecution, and together conspired to violate his civil rights based upon events that transpired during his confinement at the TCJ. Those claims arose out of an announced intention by a fellow TCJ inmate to murder an assistant district attorney and plaintiff's role in connection with that plan. Plaintiff claims that after bringing the murder threat to the attention of the assistant district attorney, and subsequently meeting with two of the defendants, he agreed to act on behalf of TCSO as an informant by pretending to assist his fellow inmate. Defendants, on the other hand, contend that as the events unfolded, it appeared to them that plaintiff had joined in the conspiracy to murder the assistant district attorney, and they therefore arrested plaintiff and charged him with second degree conspiracy, a charge that was later dismissed.

Now that discovery is complete, defendants have moved for the entry of summary judgment dismissing plaintiff's remaining claims. Defendants' motion, which plaintiff opposes, has been referred to me for the issuance of a report and recommendation. Oral argument was heard in connection with the motion on February 7, 2019, at which time decision

was reserved. Having carefully considered the parties' arguments, I now recommend that plaintiff's motion be denied.

I.    BACKGROUND[1]

Plaintiff is a former inmate of the TCJ, located in Owego, New York. Dkt. No. 159-5 at 31. On March 26, 2014, while confined within that facility, plaintiff wrote to Cheryl Mancini, an assistant district attorney for Tioga County, to warn her that a fellow inmate, David Nugent, was plotting to murder her, and that Nugent was attempting to recruit other inmates to assist him in carrying out his nefarious plan. Dkt. No. 159-6. Kirk O. Martin, the Tioga County District Attorney, learned of plaintiff's letter, and arranged to have defendants Patrick Hogan and Wayne Moulton, two investigators employed by the TCSO, meet with plaintiff regarding the allegations in his letter to Mancini. Dkt. No. 159-7 at 3-4; Dkt. No. 159-16 at 2; Dkt. No. 159-17 at 2.

A.    The April 10, 2014 Videotaped Interview

On April 10, 2014, defendants Hogan and Moulton conducted a videotaped interview of plaintiff in the presence of Alan Stone, Towner's

---

[1]    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in the plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

criminal defense attorney. Dkt. No. 159-8 at 2-3; Dkt. No. 159-9 at 2-4; *see also* Dkt. Nos. 159-1, 159-2. Although plaintiff made several attempts to discuss Nugent's desire to have him participate in a related check kiting scheme, during that meeting defendants Hogan and Moulton explained that he had not been brought "down . . . to talk . . . about checks" and that they were solely interested in what he knew regarding the Mancini plot. Dkt. No. 159-2 at 11-12.

Plaintiff explained to the investigators that when Nugent approached him to assist with the Mancini plot, he "turned [Nugent] down and told [Nugent] that [he] wasn't that kind of person." Dkt. No. 159-2 at 3. However, Nugent continued to "try[] to talk [plaintiff] into either doing the Mancini thing or finding somebody who [would murder her]." *Id.* at 3, 5-6, 10. During the interview, the following colloquy ensued:

> [Defendant Moulton]:    How would you do it? . . . .
>
> [Plaintiff]:    When I get out.
>
> [Defendant Moulton]:    When you get out.
>
> [Plaintiff]:    Well, [Nugent has] been trying to talk [his wife, Ashley Nugent, into] . . . bailing me out and like, well, I mean, I don't know if that's going to happen or not but.
>
>         . . . .

4

| | |
|---|---|
| [Defendant Hogan]: | Let me ask you this[.] If Ashley showed up here with your bail money and got you out, what do you think would happen to you if you didn't do what [Nugent] expected you to do? |
| [Plaintiff]: | I'd be in trouble probably. . . . I think I'd probably get real hurt. |

*Id.* at 5, 14-15; *see also id.* at 13. When asked how he would be paid if he did assist in the Mancini murder plot, plaintiff indicated that he would be paid by Ashley Nugent. *Id.* at 22.

Plaintiff offered to "wear a wire and go to talk to [Nugent]" about the plot. *Id.* at 17. He further indicated that he occasionally met with Nugent in the law library, and that Nugent was unconcerned about the presence of an intercom in the law library, believing that a warrant was required in order for the intercom to be used for surveillance purposes. *Id.* at 20-21. The following colloquy then ensued:

| | |
|---|---|
| [Defendant Hogan]: | . . . [W]e will give you a day and time when we want you into that law library and I want you [to] put [Nugent] on a hook. . . . |
| [Plaintiff]: | Well, to do that, I would have to . . . agree to this conspiracy to kill [Mancini], |

5

|                        | and I [have not done] that.                                                                                                                                     |
|------------------------|----------------------------------------------------------------------------------------------------------------------------------------------------------------|
| [Defendant Hogan]:     | As long as you are working for us and as long as you honest with us, you are an agent of the police; therefore, anything that you agree to do, you can't be charged with anyway. Am I correct? |
| [Attorney Stone]:      | Correct. You were acting as an agent for the police.                                                                                                            |
| [Plaintiff]:           | But, so you're telling me you want me to agree to this, because I haven't. I told him no.                                                                       |
| [Defendant Hogan]:     | He already knows that you said I'm not that kind of guy. . . . [b]ut he also knows that you know people that you could reach out to.                             |
| [Plaintiff]:           | Right.                                                                                                                                                          |
| [Defendant Hogan]:     | Or you can act on his behalf for him. [Say to him, ']Yeah, I can get to these people. I can set this fella up.['] You see what I'm saying[?]                     |

*Id.* at 27; *see also id.* at 40. Plaintiff was repeatedly cautioned by

defendants Hogan and Moulton not to take any further action until he

received their further instruction. *See, e.g.*, *id.* at 37, 39; *see also* Dkt. No.

159-9 at 4.

Near the end of the interview, when plaintiff attempted to clarify what he should "get [Nugent] to say," the conversation continued as follows:

| [Defendant Hogan]: | I want [Nugent] to tell you how he's planning on getting you out of here, and what he wants you to do once you do get out of here. That's what you're going to get back to him. All right. [']You told me you were getting me out. I want to know when I'm getting out. In return for that, what am I supposed to do for you when I get out? Who do you want me to talk to? How do you want me to handle it?['] And so, okay? |
|---|---|
| [Plaintiff]: | . . . So, am I supposed to go back and tell [Nugent] I'm now suddenly interested in doing this thing for him, I mean, like – |
| [Attorney Stone]: | I wouldn't. |
| [Defendant Hogan]: | No, I wouldn't, I wouldn't that carried away. You're not saying, you want to do it. You've already told him you're not that kind of person. You got to go back and you got to say [to Nugent], [']listen, I know people to talk to. All right? But I can't do it from in here but you told me you were getting me out.['] |

7

Dkt. No. 159-2 at 39-40.

According to defendants, the TCSO has adopted a policy by which the use of confidential informants must be approved by the Tioga County District Attorney's Office.[2] Dkt. No. 159-8 at 5-6, 16-17. Following the conclusion of the April 10, 2014 interview, the two defendants determined that plaintiff should not be used as a confidential informant due to his "credibility and untrustworthiness," and therefore did not seek the appropriate approval. Dkt. No. 159-16 at 2; Dkt. No. 159-17 at 2. That decision to forgo using him as a confidential informant, however, was not communicated to plaintiff. *See generally* Dkt. Nos. 159-16, 159-17.

Following the conclusion of the interview and through May 8, 2014, there was no further direct communication from defendants Hogan and Moulton to plaintiff, although plaintiff repeatedly attempted to contact defendant Moulton. Dkt. No. 159-5 at 50-51; *see also* Dkt. Nos. 159-8 at 6-8, 159-11, 159-12.

---

[2]    In his response to the portion of defendants' Local Rule 7.1(a)(3) Statement addressing this issue, which is properly supported with a specific citation to the record where the fact is established, plaintiff denies the statement, but fails to point the court to the precise area of the record where this fact is disputed. Dkt. No. 162 at 4-5.

B.   <u>The April 11, 2014 Law Library Meeting and Plaintiff's
Subsequent Arrest</u>

Although plaintiff had not received any further instruction from the

investigators, he nonetheless met with Nugent in the jail's law library for

more than one hour on April 11, 2014. Dkt. No. 159-10; Dkt. No. 159-5 at

43-46. Plaintiff did not use the law library's intercom while the pair spoke,

and defendants Hogan and Moulton were not made aware of this meeting

until after it had occurred.[3] Dkt. No 159-5 at 45-46; Dkt. No. 159-9 at 5-8;

*see generally* Dkt. No. 159-10.

Several days after the meeting, in an undated letter to defendant

Moulton, plaintiff stated, "[a] lot has happened since we [last] spoke[,]" and

reiterated that he "never had any intention of being involved with any of

Nugent's schemes[.]" Dkt. No. 159-11 at 1-2. Plaintiff indicated that he was

"trying to get bailed out" of the TCJ and that Nugent informed him that

---

[3]      In his response to the portion of defendants' Local Rule 7.1(a)(3) Statement
making this assertion, which is properly supported with a specific citation to the record
where the fact is established, plaintiff responds that "whether or not [d]efendants knew
plaintiff met with Nugent in the law library is a credibility question to be determined by
the jury to the extent it has any relevance in this case." Dkt. No. 162 at 5. I note than
an attack on credibility will not, by itself, present a triable question of material fact. *See
Island Software and Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 261 (2d
Cir. 2005) (citing *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (noting that "if the
[defendant] has made a properly supported [summary judgment] motion, the plaintiff
may not respond simply with general attacks upon the defendant's credibility, but rather
must identify affirmative evidence from which a jury could find that the plaintiff has
carried his or her burden").

Ashley Nugent would be posting his bail the following day. *Id.* at 2. Plaintiff

noted that once Ashley had posted his posted bail, Nugent wished for him

to partake in a check scheme and then use the proceeds "for [Nugent's]

plans to kill Mancini." *Id.* at 2. Plaintiff seemed to acknowledge that the

posting of bail was not an absolute certainty, noting, "*[i]f I am bailed out*

*tomorrow*[,] I will contact you as soon as I'm able to make a phone call." *Id.*

at 2 (emphasis added). Defendant Moulton acknowledges having received

a letter from plaintiff on or about April 14, 2014. Dkt. No. 159-17 at 3.

Plaintiff then wrote a second undated letter to defendant Moulton, in

which he stated as follows:

> [Nugent is] afraid to bail me out thinking that 'bail' is
> the overt act of the conspiracy [to murder Mancini] .
> . . . I told him that my lawyer is putting in a motion
> for [me to be released on my own recognizance] in
> Village Court. If [released on my own recognizance,]
> Ashley will be hooking up with me. . . . [P]ut me in
> play . . . Let me pretend I'm going along with these
> plans! Have a wire ready for me tomorrow after
> "court" . . . . I'll come through and you know it.

*See* Dkt. No. 159-12 at 1. Plaintiff also provided defendants Moulton with

several pages of documents regarding "what [Nugent] wants me to do with

Ashley [upon my release]" and which appear to refer to the check kiting

scheme. Dkt. No. 159-12. Although defendant Moulton has acknowledged

receiving this and plaintiff's prior letter, he did not respond to either one.

Dkt. No. 159-17 at 13.

According to electronically-maintained notes contained in the
TCSO's computer-aided dispatch system, a representative from that office
learned that Mancini did not wish to pursue criminal charges against
Nugent. Dkt. No. 162-6 at 1. The following day, a TCSO representative
then met with Nugent and informed him that although he had been the
subject of a criminal investigation regarding his plan to kill Mancini,
charges were not being pursued. *Id.* at 1. Nugent was cautioned to cease
his "[j]ail house rantings." *Id.* at 1. Those notes do not make any mention
of Nugent's check kiting scheme. *See generally id.*

On May 8, 2014, defendant Hogan learned that Ashley Nugent had
posted bail for plaintiff's release from the TCJ, and asked defendant
Clifford Alexander, an investigator employed by the TCSO, to assist him
by interviewing plaintiff. Dkt. No. 159-16 at 3-4; Dkt. No. 159-18 at 2; *see
also* Dkt. No. 159-1. Just as plaintiff was about to leave the facility he was
intercepted by defendant Hogan and asked to join defendants in an
interview room. Dkt. No. 159-16 at 4-5. Plaintiff was read his *Miranda*[4]
rights, and defendant Alexander asked him why he was being bailed out
by Ashley Nugent. Dkt. No. 159-3 at 3-4. Almost immediately, plaintiff

---

[4]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

expressed confusion, and stated:

> . . . I was under the understanding that I was . . . an agent of the police when we sat in the room across the hall with my lawyer, that I was asked to do certain things. I did those things and cooperated fully. I was under the understanding that I was still cooperating with the Sheriff's Office and District Attorney's Office, and intend to continue to cooperate but you just came in here and read *Miranda* Rights and stuff, so I have no idea what that's about.

*Id.* at 4-5. Defendant Alexander explained that plaintiff was being detained, and plaintiff requested to speak with defendant Hogan. *Id.* at 5.

Approximately forty minutes after defendant Alexander left the room, defendant Moulton entered. Dkt. No. 159-3 at 6. Plaintiff indicated that he believed he was working for the police and that he had been brought to the room so that defendants could "give me my wire and go trap" Ashley Nugent. *Id.* at 6-7. Plaintiff began to express frustration, and stated:

| [Plaintiff]: | . . . that is not how you treat a cooperating informant. |
| --- | --- |
| [Defendant Moulton]: | We never . . . said you were an informant. |
| [PLAINTIFF]: | [Defendant] Hogan said I was an agent [for] the police[.] |

*Id.* at 10. Plaintiff then stated his belief that defendants were "trying to do something shady" and invoked his right to an attorney. *Id.* at 13-16.

According to defendant Hogan, he consulted with the Tioga County District Attorney's Office and decided that plaintiff should be arrested by defendant Alexander for the crime of conspiracy in the second degree, in violation of N.Y. Penal Law § 105.15. Dkt. No. 159-16 at 4; *see also* Dkt. No. 159-14. In response to being informed by defendant Alexander that he was under arrest, plaintiff asserted that he did not understand why he was being charged when he was "working with [the Tioga County Sheriff's] office[.]" Dkt. No. 159-3 at 18.

On May 9, 2014, the day following his arrest for conspiracy, an unrelated warrant was issued for plaintiff's arrest on a charge of grand larceny in the second degree, and plaintiff was subsequently sentenced to three to six years of imprisonment in a state facility in connection with that charge.[5] Dkt. Nos. 159-1 at 4, 159-15. On November 5, 2015, the conspiracy charge against plaintiff was dismissed.[6] Dkt. No. 122 at 6.

---

[5]    In support of their motion for summary judgment, defendants argue that because of the issuance of that warrant unrelated charges, his claims must fail because he would have been "deprived of his liberty interest regardless of what occurred on May 8, 2014[.]" Dkt. No. 159-21 at 15. During oral argument, however, defendants' counsel conceded that plaintiff's subsequent arrest is relevant to the issue of damages, rather than liability, and appeared to acknowledge that the subsequent arrest would not necessarily foreclose plaintiff from recovering some measure of damages in this action.

[6]    Although the parties do not dispute that the charge against plaintiff was dismissed, because the exact reason for the dismissal is not disclosed in the present record, it is not clear whether the criminal proceeding was terminated in a manner that affirmatively indicated plaintiff's innocence, or instead on some other ground. *See*

II.    <u>PROCEDURAL HISTORY</u>

Plaintiff, who initially proceeded *pro se*, commenced this action in Tioga County Supreme Court asserting various claims under 42 U.S.C. § 1983, 18 U.S.C. § 242, and New York state law. Dkt. No. 2. On August 5, 2015, defendants removed the action to this court pursuant to 28 U.S.C. §§ 1331, 1441(a) and filed an answer. Dkt. Nos. 2, 5. By text order dated February 12, 2016, the court granted plaintiff's motion for leave to proceed *in forma pauperis.* Dkt. No. 44.

Plaintiff's present counsel entered an appearance in the action on February 1, 2016. Dkt. No. 38. Following motion practice, *see* Dkt. Nos. 48, 56, 57, plaintiff's counsel was granted leave to file an amended complaint. Dkt. No. 67. In lieu of answering, defendants filed a motion to dismiss plaintiff's amended complaint. Dkt. No. 72. In response, plaintiff filed a cross-motion for leave to file a late notice of claim, Dkt. No. 73, and requested leave to further amend his complaint to add a claim that was "inadvertently omitted." Dkt. No. 99.

By summary order dated November 7, 2017, Senior District Judge

---

*generally Lanning v. City of Glens Falls*, 908 F.3d 19, 24-29 (2d Cir. 2018) (affirming dismissal of malicious prosecution claim because the termination of charges in the plaintiff's case was "consistent with dismissal on any number of procedural or jurisdictional grounds, all of which fail to affirmatively indicate innocence"), *affirming* 2017 WL 922058 (N.D.N.Y. Mar. 08, 2017) (D'Agostino, J.).

Gary L. Sharpe dismissed plaintiff's negligence claims and his state law claims against all defendants in their official capacities. Dkt. No. 111 at 1 n.1. In that decision, however, Judge Sharpe denied the remainder of defendants' motion to dismiss with leave to renew, and afforded plaintiff "one last opportunity to amend his complaint." *Id*. at 2.

On December 15, 2017, plaintiff filed a second amended complaint, of which defendants once again sought dismissal. Dkt. Nos. 122, 124. By memorandum-decision and order dated March 2, 2018, Judge Sharpe narrowed the claims contained within plaintiff's second amended complaint to those alleging false arrest, malicious prosecution, and conspiracy to violate plaintiff's civil rights pursuant to 42 U.S.C. § 1983 against the three remaining defendants.[7] *See generally* Dkt. No. 149.

On May 31, 2018, following the close of discovery, defendants moved for the entry of summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing plaintiff's remaining claims. Dkt. No. 159. Plaintiff has responded in opposition to the motion, and

---

[7]     In that memorandum-decision and order, Judge Sharpe dismissed, *inter alia*, plaintiff's substantive due process claim. Dkt. No. 149. During oral argument on February 7, 2019, plaintiff's counsel invited the court to reconsider this portion of Judge Sharpe's determination, despite not having moved for reconsideration. Even assuming plaintiff's request was properly before the court, which it was not, the court would decline plaintiff's invitation.

defendants have since replied in further support. Dkt. Nos. 162, 164.

Defendants' motion is now ripe for determination, and has been referred to

me for the issuance of a report and recommendation pursuant to 28

U.S.C. § 636(b)(1)(B).

III.    DISCUSSION

    A.    Legal Standard Governing Summary Judgment Motions

        Summary judgment motions are governed by Rule 56 of the Federal

Rules of Civil Procedure. Under that provision, the entry of summary

judgment is warranted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247

(1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391

F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this

inquiry if it "might affect the outcome of the suit under the governing law."

*Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549,

553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248.

        A party moving for summary judgment bears an initial burden of

demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Emp'rs Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B.  Plaintiff's Response to Defendants' Local Rule 7.1(a)(3) Statement

In their reply, defendants observe that in several instances plaintiff failed to properly respond to their Local Rule 7.1(a)(3) Statement, which

sets forth the material facts that defendants assert are not in dispute. Dkt.

No. 164-2 at 4-5. Defendants request that the court deem several

statements contained within their Local Rule 7.1(a)(3) Statement to have

been admitted by plaintiff to the extent that the response provided was

deficient under the relevant local rules. *Id.*

By its terms, Local Rule 7.1 provides, in pertinent part, that:

> Each denial shall set forth a specific citation to
> the record where the factual issue arises. <u>The Court</u>
> <u>shall deem admitted any properly supported facts</u>
> <u>set forth in the Statement of Material Facts that the</u>
> <u>opposing party does not specifically controvert.</u> The
> non-movant's response may also set forth a short
> and concise statement of any additional material
> facts that the non-movant contends are in dispute in
> separately numbered paragraphs, followed by a
> specific citation to the record where the fact is
> established.

N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have

routinely enforced this rule in the event of a non-movant's failure to

properly respond to a Local Rule 7.1(a)(3) Statement. *See, e.g.*, *Elgamil v.*

*Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug.

22, 2010) (McCurn, J.) (listing cases).

Here, defendants' initial moving papers properly included a

statement of undisputed material facts, as required under Local Rule

7.1(a)(3) of this court. Dkt. No. 159-20. In opposition, although plaintiff

controverted several paragraphs within that statement, in some instances he failed to set forth a specific citation to the record where a factual issue arises, as the local rule requires. Dkt No. 162. By way of one example, in response to paragraph twelve of defendants' Local Rule 7.1(a)(3) Statement, plaintiff stated that he "denie[d] the allegations set forth in [paragraph] 12 as that raises credibility issues as to the defendants' awareness that require jury resolution." Dkt No. 162 at 2. This response is plainly improper under the court's local rules. N.D.N.Y. L.R. 7.1(a)(3)

Although plaintiff's counsel is well aware of the obligation that is outlined in Local Rule 7.1(a)(3), *see, e.g.*, *Bradford v. Norwich City Sch. Dist.*, 54 F. Supp. 3d 177, 180, 184 (N.D.N.Y. 2014) (Suddaby, C.J.), the court remains mindful that the Second Circuit has underscored the desirability of resolving litigated matters based upon relative merit, rather than on the basis of a procedural or technical default. *See, e.g., Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95-96 (2d Cir. 1993); *Meehan v. Snow*, 652 F.2d 274, 277 (2d Cir. 1981). Therefore, for purposes of the pending motion, the court will deem admitted any facts set forth in defendants' Local Rule 7.1(a)(3) Statement, which are supported by evidence in the record and that have not been contested by plaintiff. Where plaintiff has contested a particular statement, but has not cited to portions of the record

refuting the statement, I have opted to review the record to determine whether the fact has been proven. *See, e.g.*, Dkt. No. 162 at ¶¶ 12, 24, 41-47, 51, 67-68, 72, 73, 83, 85, 86.

C.    Probable Cause

The primary argument advanced by defendants in support of their motion for summary judgment is based upon their contention that because probable cause supported plaintiff's arrest for the crime of conspiracy in the second degree in violation of N.Y. Penal Law § 105.15, his claims for malicious prosecution and false arrest must be dismissed.[8] Dkt. 159-21 at 8-15; *see also* Dkt. No. 164-2 at 7-8. In response, plaintiff contends that because there is a material issue of fact with respect to whether probable causes existed, defendants' motion for summary judgment must be denied. Dkt. No. 162-9 at 4-10.

---

[8]      In their reply, defendants also contend that arguable probable cause existed, and the court should therefore find that defendants are entitled to qualified immunity. Dkt. No. 164-2 at 7-8. Although defendants' initial motion papers refer to the reasonableness of plaintiff's arrest, I disagree that the initial papers can reasonably be construed to assert an argument with respect to the qualified immunity. Accordingly, because the qualified immunity argument was raised for the first time in defendants' reply papers, thereby depriving plaintiff of the opportunity to respond, the argument will not be considered. *See, e.g.*, *Tillery v. NYS Office of Alcohol & Substance Abuse Servs.*, No. 13-CV-1528, 2014 WL 2434954, at *3 n.6 (N.D.N.Y. May 30, 2014) (Kahn, J.) (citing *United States v. Yousef*, 327 F.3d 56, 115 (2d Cir. 2003)).

1.   <u>False Arrest</u>

A claim for false arrest or imprisonment brought pursuant to section 1983 "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *see Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).[9] "To establish a claim for false arrest under [section 1983], a plaintiff must show that 'the defendant intentionally confined him without his consent and without justification.' " *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (quoting *Weyant*, 101 F.3d at 852).

" 'Because probable cause to arrest constitutes justification, there can be no claim for false arrest where the arresting officer had probable cause to arrest the plaintiff,' " even if the plaintiff is subsequently acquitted of all charges. *Dufort v. City of New York*, 874 F.3d 338, 347 (2d Cir. 2017) (quoting *Escalera*, 361 F.3d at 743); *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (observing that probable cause is a "complete defense" to a false arrest action). "Probable cause for arrest

---

[9]     A section 1983 claim for false arrest sounding in the Fourth Amendment is "substantially the same" as a claim for false arrest under New York law. *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003).

exists if the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) (quoting *Weyant*, 101 F.3d at 85). This standard is objective, and is informed by the "totality of the circumstances," *Caldarola v. Calabrese*, 298 F.3d, 156, 162 (2d Cir. 2002), requiring the court to consider the facts available to the officer at the time of the arrest and immediately before it, *see Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996).

In deciding whether probable cause to arrest exists, a police officer is entitled to rely on the victim's allegations that a crime has been committed. *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citing *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995)). A police officer is also entitled to rely on the statements of fellow police officers. *Martinez*, 202 F.3d at 634 (citing *Bernard v. U.S.*, 25 F.3d 98, 102-03 (2d Cir. 1994)). The evidence needed to establish probable cause is less than that necessary to support a conviction. *Krause v. Bennett*, 887 F.2d 362, 370 (2d Cir. 1989). Probable cause may be determined as a matter of law

on a motion for summary judgment if there is no dispute as to the pertinent events and the knowledge of the police officer. *Weyant*, 101 F.3d at 852.

Significantly, probable cause is "a fluid concept . . . not readily, or even usefully, reduced to a neat set of legal rules." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007) (alteration in original) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "While probable cause requires more than a 'mere suspicion,' of wrongdoing, its focus is on 'probabilities,' not 'hard certainties[.]' " *Walczyk*, 496 F.3d at 157 (internal citations omitted).

In the present case, defendants contend that probable cause existed to arrest plaintiff for conspiracy in the second degree in violation of Penal Law § 105.15.[10] In support of that contention, they point to numerous facts that were known to defendants at the time of plaintiff's May 8, 2014 arrest.[11] Dkt. No. 159-21 at 10-11. Although these facts, when taken

---

[10]     "A person is guilty of conspiracy in the second degree when, with intent that conduct constituting a class A felony be performed, he agrees with one or more persons to engage in or cause the performance of such conduct." N.Y. Penal Law § 105.15; *see generally People v. Reyes*, 831 N.Y.3d 930 (2018) (describing the general elements of a conspiracy offense). "Essential to conviction for that conspiracy is proof of an overt act committed by one of the conspirators in furtherance of the conspiracy." William C. Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 38, Penal Law § 105.00 (citing N.Y. Penal Law § 105.20). This is because overt act "provides corroboration of the existence of the agreement and indicates that the agreement has reached a point where it poses a sufficient threat to society to impose sanctions." *People v. McGee*, 49 N.Y.2d 48, 58 (1979). The overt act "must be an independent act that tends to carry out the conspiracy." *People v. Ribowsky*, 77 N.Y.2d 284, 293 (1991).

[11]     According to defendants, the following facts were known to defendant Hogan

_____

and Moulton at the time of plaintiff's arrest on May 8, 2014:

- In the April 10 interview, Plaintiff described an alleged conspiracy to arrange the murder of Assistant District Attorney Mancini which involved Mrs. Nugent bailing him out so he could either murder Ms. Mancini or run a check fraud scheme to raise money to hire someone else to murder Ms. Mancini;

- Defendants had expressly instructed Plaintiff during the April 10 interview, multiple times, that he was not to take any step – including luring Nugent into the law library – until they gave him directions with a specific day and time;

- Defendants decided not to employ Plaintiff as a confidential informant or "agent of the police";

- Defendants did not submit paperwork to the District Attorney or obtain the District Attorney's approval to use Plaintiff as a confidential informant or agent;

- Plaintiff had met with Nugent in the law library without any instruction and without notifying Defendants of the meeting;

- Plaintiff sent Defendant Moulton a letter urging Defendant Moulton to "put him in play";

- The letter expressed that Plaintiff simply wanted to get bailed out of jail and/or released on his own recognizance;

- Neither Defendant Moulton nor any other Defendant responded to the letter;

- Plaintiff sent Defendant Moulton a further letter seeking to be used as a confidential informant;

- Neither Defendant Moulton nor any other Defendant responded to that letter;

- Plaintiff was never given a date or time to lure Nugent into the law library, or do anything else;

- Mrs. Nugent attempted to bail Plaintiff out on May 8, 2014;

- Plaintiff gave Defendants no notice that Mrs. Nugent was going to bail him out on May 8, 2014;

isolation, could be sufficient to demonstrate the existence of probable

cause, the court cannot overlook other facts that were known to

defendants at the time of Towner's arrest.

First, this matter stems from plaintiff's unprompted letter to Mancini

on March 26, 2014, which warned her of Nugent's plan to murder her. Dkt.

No. 159-6. As a direct result of the letter, plaintiff and his criminal defense

attorney voluntarily participated in an April 10, 2014 videotaped interview

with defendants Hogan and Moulton. *See generally* Dkt. No. 159-2. During

that interview, plaintiff indicated that he was not the type of person that

would participate in Nugent's plan and that he had, in fact, already "turned

[Nugent] down[.]" Dkt. No. 159-2 at 2-3. Plaintiff, who had pending charges

at the time of the interview, conveyed to defendants several times that he

---

- When Mrs. Nugent attempted to bail Plaintiff out, Plaintiff did not contact Defendants or send them a message that this was occurring, but went along with the attempt to bail him out;

- Upon Defendant Hogan intercepting Plaintiff and Defendants Moulton and Alexander interviewing him, Plaintiff was evasive and would not directly answer questions as to the purpose of his being bailed out by Mrs. Nugent; and

- When Defendant Moulton attempted to press Plaintiff to directly answer the question as to the reason he was being bailed out, Plaintiff asked to speak to his attorney rather than answer the question.

Dkt. No. 159-21 at 10-11.

simply wanted to be released from the TCJ. *See, e.g.*, Dkt. No. 159-2 at 33, 41.

After providing the investigators with details regarding Nugent's plan, plaintiff expressed hesitation with assisting any further because it would have required him "to . . . agree to this conspiracy to kill this D.A., and I [have not done] that." *Id.* at 26-27. In response, defendant Hogan assured plaintiff, "[a]s long as you are working for us and as long as you [are] honest with us, you are an agent of the police; therefore, anything that you agree to do, you can't be charged with anyway." *Id.* at 27. Plaintiff's criminal defense attorney interjected and confirmed to plaintiff, "[c]orrect. You were acting as an agent for the police." *Id.*

Plaintiff then attempted to clarify how he would approach Nugent when he had already declined to participate in the Mancini plot. *Id.* In response, defendant Hogan acknowledged that Nugent was aware that plaintiff was "not that kind of guy," but encouraged him to say to Nugent, " 'Yeah, I can get to these people. I can set this fella up [for you to assist in the conspiracy].' " *Id.*

Thereafter, plaintiff was cautioned several times to await for further instructions before he engaged Nugent. *Id.* at 37-38. Plaintiff, however, continued to express confusion, stating, " I am trying to figure out a way to

do this without me getting put out there." *Id.* at 39. Plaintiff again attempted

to clarify what he should say to Nugent, and the following exchange

ensued:

| | |
|---|---|
| [Defendant Hogan]: | I want [Nugent] to tell you how he's planning on getting you out of here, and what he wants you to do once you do get out of here. That's what you're going to get back to him. All right. [Say to him, ']You told me you were getting me out. I want to know when I'm getting out. In return for that, what am I supposed to do for you when I get out? Who do you want me to talk to? How do you want me to handle it?['] And so, okay? |
| [Plaintiff]: | . . . . So, am I supposed to go back and tell him I'm now suddenly interested in doing this thing for him, I mean, like – |
| [Attorney Stone]: | I wouldn't. |
| [Defendant Hogan]: | No, I wouldn't, I wouldn't get that carried away. You're not saying, you want to do it. You've already told him you're not that kind of person. You got to go back and you got to say, [']listen, I know people to talk to. All right? But I can't do it from in |

27

here but you told me you
were getting me out.[']

*Id.* at 39-40. Drawing all reasonable inferences in favor of the non-moving

party, it appears that although plaintiff was told to wait for further

instruction, he left the April 10, 2014 interview with the impression that

while he was waiting for the investigator's direction, he still needed to

communicate to Nugent that he was willing to assist with the plot and that,

in doing so, he was working on behalf of, and at the request, of

defendants.

Defendants have stated that due to concerns regarding plaintiff's

credibility and trustworthiness, they decided that they would not use him

as a confidential informant. *See* Dkt. No. 159-8 at 5-6, 16-17. That

decision, however, was not communicated to plaintiff until after he was

detained on May 8, 2014. Dkt. No. 159-3 at 10 ("[W]e never said you were

an informant."). Defendants argue that plaintiff's two letters evince his

awareness that he had not been retained as a confidential informant, but

when all reasonable inferences are drawn in his favor as the non-moving

party, the court disagrees. A reasonable reading of those letters indicates

that plaintiff believed that he was working on behalf of defendants and that

he was hoping that his cooperation would lead to favorable consideration

in connection with his pending charges or his release from the TCJ. *See generally* Dkt. Nos. 159-11, 159-12.

Although he did not specifically disclose his April 11, 2014 law library meeting in his two letters, plaintiff nonetheless continued to keep defendants abreast of the general conversations that he was having with Nugent. *See generally* Dkt. Nos. 159-11, 159-12. In addition, plaintiff apparently believed that all conversations in the law library were recorded. Dkt. No. 159-3 at 11-12 ("I know you guys were taping the whole conversation.").

When plaintiff was detained for questioning on May 8, 2014, he was characterized by defendants as being evasive. When all reasonable inferences are drawn in favor of plaintiff, however, a factfinder could disagree. When plaintiff was asked who was bailing him out of the TCJ, he disclosed that it was Ashley Nugent. Dkt. No. 159-3 at 3. In addition, when plaintiff was asked why she had chosen to bail him out on that specific day, rather than earlier as plaintiff's letter suggested, *see, e.g.* Dkt. No. 159-11, plaintiff stated that it was because she had finally obtained the appropriate number of signatures for purposes of bail. Dkt. No. 159-3 at 10. Moreover, although defendants fault plaintiff for invoking his right to an attorney, it is clear that as the interview progressed and he was left alone

in the room for long periods of time, he was increasingly confused and frustrated with respect to why he was being detained and was seeking clarification from his attorney regarding his perceived cooperation with defendants with respect to Nugent's plan. *Id.* at 13-14.

Because the court is required view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments, I conclude that there are genuine issues of material fact precluding summary judgment. Although defendants have provided the court with facts known to defendants at the time of the arrest, the court may not, on a motion for summary judgment, credit their version of the facts and enter judgment based on its own view that their version was more likely than not true. The weighing of the evidence and the determination as to which version of the relevant events to accept are matters reserved for a jury. If a jury were to credit plaintiff, it would be entitled to conclude that it was more likely than not that when plaintiff was arrested, probable cause did not exist. Accordingly, I recommend that defendants' motion for summary judgment be denied on this basis.

### 2.    Malicious Prosecution

In order to prevail on a section 1983 malicious prosecution claim

against a state actor, a plaintiff must show "a violation of [the plaintiff's] rights under the Fourth Amendment," as well as "the elements of a malicious prosecution claim under state law." *Manganiello v. City of N.Y.*, 612 F.3d 149, 160-61 (2d Cir. 2010); *see Washington v. Cty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004). Therefore, in order to establish a malicious prosecution claim under New York law, a plaintiff must prove the following four elements: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* at 161 (quotation marks omitted); *see also Savino v. City of N.Y.*, 331 F.3d 63, 72 (2d Cir. 2003).

The court notes that "[t]he probable cause determination relevant to a malicious prosecution claim differs from that relevant to a false arrest claim, and the two determinations play different roles in the two causes of action." *Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000); *see also Boyd v. City of New York*, 336 F.3d 72, 75-77 (2d Cir. 2003). However, if a plaintiff—as is the case here—"does not allege that there was any difference in the facts known to the police officers between arrest and arraignment," the court need " 'analyze only the existence of

31

probable cause at the time of [ ] arrest[ ].' " *Lanning*, 2017 WL 922058, at

*6 (quoting *Kanderskaya v. City of New York*, 11 F. Supp. 3d 431, 436 n.1

(S.D.N.Y. 2014)).

In the present case, as defendants correctly observe, *see* Dkt. No.

159-21 at 8, 15, plaintiff does not allege that defendants learned of

intervening facts between the time of his arrest on May 8, 2014 and his

arraignment later that same day. Accordingly, the court's probable cause

analysis with respect to plaintiff's malicious prosecution claim is governed

by the same analysis that informs plaintiff's false arrest claim. Accordingly,

for the reasons more exhaustively outlined in Point III.C.1. above, I find

that material questions of fact remain with respect to whether probable

cause existed to arrest plaintiff for conspiracy in the second degree. For

this reason, I recommend that defendants' motion to dismiss plaintiff's

malicious prosecution claim be denied.

### 3.    Personal Involvement

Citing their alleged lack of participation, defendants Moulton and

Alexander argue that they cannot be found liable for plaintiff's claims of

false arrest and malicious prosecution, and defendant Hogan similarly

maintains that he cannot be held liable for plaintiff's malicious prosecution

claim. Dkt. No. 159-21 at 16-19. " '[P]ersonal involvement of defendants in

alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983. *See Ashcroft v. Iqbal*, 556 U.S. 622, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "To be sufficient before the law, a complaint must state precisely who did what and how such behavior is actionable under law." *Hendrickson v. U.S. Attorney Gen.*, No. 91-CV-8135, 1994 WL 23069, at *3 (S.D.N.Y. Jan. 24, 1994).

I turn first to defendant Hogan's argument that he cannot be held liable for malicious prosecution because "[h]e had no involvement in the criminal prosecution, did not appear at [p]laintiff's arraignment, and although he was told to make himself available for [p]laintiff's preliminary hearing, did not end up having to attend it." Dkt. No. 159-21 at 17-18.

Defendant Hogan acknowledges, however, that he was actively involved in the investigation of plaintiff. Dkt. No. 159-14. Defendant Hogan participated in the April 10, 2014 videotaped interview of plaintiff, asked plaintiff to "join [him] in the interview room" on May 8, 2014, consulted with the Tioga County District Attorney's Office, and ultimately decided that plaintiff should be arrested. Dkt. No. 159-16. Defendant Hogan laid the groundwork for the signing and filing of the accusatory instrument against plaintiff. Dkt. No. 159-14. On this record, the court is unable to conclude that " the decision made by the prosecutor to bring criminal charges was independent of any pressure exerted by [the] police."[12] *Hartman v. Moore*, 547 U.S. 250, 263 (2006); *Felmine v. City of New York*, No. 09-CV-3768, 2011 WL 4543268, at *11 (E.D.N.Y. Sept. 29, 2011) ("[P]laintiffs have succeeded in demonstrating that the officers initiated criminal proceedings by having the plaintiff arraigned, by filling out complaining and corroborating affidavits, or by signing felony complaints.").

Defendant Moulton's contention that he was not involved in the

---

[12]     The court notes that " '[a]lthough there is a presumption that a prosecutor exercises independent judgment in deciding whether to initiate and continue a criminal proceeding, an arresting officer may be held liable for malicious prosecution when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors . . . or when [he or] she withholds relevant and material information.' " *Deanda v. Hicks*, 137 F. Supp. 3d 543, 575 (S.D.N.Y. 2015) (quoting *Mitchell v. Victoria Home,* 434 F.Supp.2d 219, 227 (S.D.N.Y.2006)).

decision to prosecute or arrest plaintiff fails for many of the same reasons. Defendant Moulton had significant involvement in the investigation by interviewing plaintiff on April 10, 2014, as well as when plaintiff was detained on May 8, 2014. Although he did not consult with the District Attorney's Office or decide to arrest plaintiff as his colleague did, he nonetheless laid the groundwork for plaintiff's arrest and prosecution.

While defendant Alexander's role in the overall investigation appears to have been much more limited, inasmuch as he questioned plaintiff for only a brief period of time during Towner's detention, *see* Dkt. No. 159-3 at 2-5, he nonetheless drafted and signed the accusatory instrument and effectuated plaintiff's arrest, albeit at defendant Hogan's request. Dkt. No. 159-13 at 2, 159-18. Accordingly, a reasonable factfinder could conclude that he was personally involved.

Finally, with respect to all three defendants, personal involvement can also include a police officer's failure to protect a civilian's constitutional rights. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Accordingly, material issues of fact remain concerning defendants' involvement in the arrest and prosecution of plaintiff for conspiracy in the second degree. I recommend that defendants' motion be denied on this basis.

D.    Conspiracy

In order to sustain a conspiracy claim under section 1983, "a plaintiff

must show: (1) an agreement between two or more state actors or

between a state actor and a private entity; (2) to act in concert to inflict an

unconstitutional injury; and (3) an overt act done in furtherance of that goal

causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir.

1999); *accord McGee v. Dunn*, 672 F. App'x 115, 116 (2d Cir. 2017). Mere

conclusory allegations that are unsupported by any record evidence are

insufficient to give rise to a genuine dispute of material fact. *See, e.g.*,

*Hilson v. Maltese*, No. 09-CV-1373, 2012 WL 6965105, at *6 n.10

(N.D.N.Y. Dec. 14, 2012) (Baxter, M.J.), *report and recommendation*

*adopted by* 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013) (Mordue, J.)

("Plaintiff's conclusory assertion . . . is not sufficient to establish a material

issue of fact[.]" (listing cases)); *see also Sommer v. Dixon*, 709 F.2d 173,

175 (2d Cir. 1983).

Here, the sole argument advanced by defendants with respect to

plaintiff's conspiracy claim is that it must fail because Towner cannot

establish his underlying claims for either malicious prosecution or false

arrest.[13] Dkt. No. 159-21 at 16. However, as was described in more detail

---

[13]    I note that defendants have not argued, for example, that plaintiff's conspiracy

in Point III.C. above, an issue of material fact remains for trial with respect to whether probable cause existed to arrest the plaintiff. Accordingly, I recommend that the portion of defendants' motion seeking dismissal of plaintiff's conspiracy cause of action be denied on this basis.

IV.    <u>SUMMARY AND RECOMMENDATION</u>

Defendants have moved for summary judgment dismissing plaintiff's remaining claims, arguing that his claims are barred because probable cause existed to arrest plaintiff for conspiracy in the second degree based upon his role in his fellow inmate's plan to murder an assistant district attorney. Although the record before the court demonstrates that there are very few factual disputes remaining between the parties, the court is unable to determine, as a matter of law, that probable cause existed to arrest and prosecute plaintiff, and finds instead that the issue should be submitted for consideration for the jury.

The record reveals that plaintiff exposed a plot to murder the assistant district attorney and offered repeatedly to cooperate with law

---

claim is precluded by the intra-agency, or intra-corporate, conspiracy doctrine, which provides that " 'officers, agents, and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring with each other.' " *Trombley v. O'Neill*, 929 F. Supp. 2d 81, 97 (N.D.N.Y. 2013) (Suddaby, C.J.) (quoting *Fitzgerald v. City of Troy*, N.Y., No. 10-CV-451, 2012 WL 5986547, at *23 (N.D.N.Y. Nov. 28, 2012)).

enforcement officials in exposing his fellow inmate's plan, obviously hoping

to gain favorable consideration in connection with the unrelated charges

pending against him. While defendants feign surprise at efforts by Ashley

Nugent to bail Towner out of jail on May 8, 2014, plaintiff previously wrote

to defendant Moulton informing him that she would be doing so, and

stating that he would make contact with investigators once released.

Against this backdrop, a reasonable factfinder could conclude, based upon

these facts, that probable cause to believe plaintiff had effectively switched

sides and joined the conspiracy, which he himself exposed, simply did not

exist. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion for summary judgment

(Dkt. No. 159) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report. Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this

report and recommendation upon the parties in accordance with this

court's local rules.


David E. Peebles
U.S. Magistrate Judge


Dated:     February 15, 2019
           Syracuse, New York